**TSUYOSHI IWAMOTO, Appellant,**

v.

**John Foster DULLES, Secretary of State of the United States, Appellee.**

**No. 15441.**

United States Court of Appeals
Ninth Circuit.

Dec. 10, 1957.

As Amended Feb. 3, 1958.

Shiro Kashiwa, Genro Kashiwa, Kashiwa & Kashiwa, Honolulu, Hawaii, for appellant.

Louis B. Blissard, U. S. Atty., Charles B. Dwight, III, Asst. U. S. Atty., Honolulu, Hawaii, for appellee.

Before STEPHENS, Chief Judge, and ORR and FEE, Circuit Judges.

JAMES ALGER FEE, Circuit Judge.

Iwamoto, who is appellant here, filed a complaint under provisions of the Nationality Act of 1940,[1] seeking to obtain a declaration that he is a national of the United States. There was an answer filed. A trial was held. The District Court found that Iwamoto made a "cold and calculated choice" of Japanese citizenship when "he was not intimidated or coerced in any manner" and thus had "voluntarily expatriated himself" as a national of the United States. A judgment was entered in favor of the Secretary of State and against Iwamoto, wherein the relief prayed for was denied. Appeal followed.

There are minor questions of law involved. Appellant urges that the judgment of the District Court may be set aside if this Court holds any material finding of fact clearly erroneous. This is familiar law. The principle is expressly crystallized by rule.[2]

Appellant contends that the United States must show by clear, convincing and positive evidence that he, Iwamoto, was not coerced or intimidated when he reacquired Japanese citizenship. This is not a problem here.[3] If there were no

---

1. Section 503, Nationality Act of 1940, 54 Stat. 1171, 8 U.S.C.A. § 903 (1942), now 8 U.S.C.A. § 1503; section 405 of Immigration and Nationality Act of 1952, 66 Stat. 280, 8 U.S.C.A. § 1101 note.

2. Rule 52(a), Federal Rules of Civil Procedure, 28 U.S.C.A.

3. The ruling of the trial court did not depend upon the onus of burden of proof. The findings were based upon the evidence as a whole and the credibility which the trial judge accorded Iwamoto. Neither the holding of the trial court nor our opinion is in conflict with the

evidence on the subject, the burden of proof might be a factor. This Court is confronted with a finding of fact by the trial court:

"That in deciding whether to re-acquire Japanese Nationality Plaintiff took refuge in the Japanese law, which he had discovered exempted a person in his position from service in the Japanese Armed Services if he acquired Japanese Nationality.

"That Plaintiff made a cold and calculated choice in favor of Japanese citizenship. He was not intimidated or coerced in any manner. In this fashion Plaintiff voluntarily expatriated himself from the U. S. Nationality."

The sole question is whether there was evidence in the record to sustain the finding that the act admittedly done was voluntary and whether or not the finding was clearly wrong or manifestly against the weight of the evidence.

As noted above, the finding is that the reacquisition of Japanese nationality by Iwamoto was voluntary and without intimidation or coercion. There was positive evidence to sustain these findings. The question is one of the state of mind of Iwamoto. No one can testify directly upon the subjective feelings and motives of Iwamoto except Iwamoto. This is a familiar problem in many instances, such as in criminal cases. Iwamoto testified positively that he acted under duress of the Kempei-Tai or military police of Japan. But the trial court had a right to take into consideration the vital interest which he had in the outcome of the case.

Iwamoto did apply formally to the Japanese Ministry of Home Affairs for recovery of Japanese nationality on July 27, 1942. Permission of the Japanese government was granted on September 21, 1942. The Japanese Ministry of Home Affairs included his name in the list, compiled by it, of persons recovering

Japanese nationality. His family register, a copy of which was admitted in evidence, showed his status after that act as a Japanese national.

It is then urged that there was no clear and convincing evidence that Iwamoto voluntarily expatriated himself as a national of the United States. Whatever test is applied, however, the answer is the same. A history of the events shows that the facts are conclusive against his present claim.

Iwamoto was born in 1916 in Hawaii. Both of his parents were subjects of the Emperor of Japan, and his birth was registered with the Japanese government. He was educated in the elementary and high schools of Hawaii. He received a certificate of United States citizenship. In 1934, he went to Japan and entered middle school, from which he graduated. Thereupon, he entered preparatory school, and in March, 1940, entered Keyo University. He had played baseball at all these schools, and became a member of the Keyo University Team. With this outfit he visited Hawaii as first baseman for forty days in July and August, 1940. While there, he expatriated himself as a Japanese national and returned to Japan with the team on an American passport. He registered as an alien as required by Japanese law.

He was a baseball hero. After his return, as an athlete he received special privileges. He lived in a dormitory especially set aside for baseball players. Notwithstanding he was the only United States citizen on the team to the knowledge of some of his teammates, he was, in April, 1942, after the war had been some months in progress, elected Captain of the Keyo University baseball team. This is a highly significant circumstance. It is also of importance that he had never been mistreated or molested up to this time. He was, it is true, required to obtain travel requests to go outside metropolitan Tokyo, but there was no diffi-

decisions of this Circuit in Fukomoto v. Dulles, 9 Cir., 216 F.2d 553, or those of other Circuits in Stipa v. Dulles, 3 Cir., 233 F.2d 551, or Monaco v. Dulles, 2 Cir., 210 F.2d 760.

culty involved and he was never refused such a permit.

His story of how he came to apply for Japanese nationality is here epitomized. In May or June, 1942, he was visited by two armed military police and his room was searched before he met them. As stated in the brief of appellant:

"He was asked why he was expatriated, his reply was that he intended to go back to Hawaii after he graduated. He was called a 'traitor' and 'crazy'. He was threatened internment but he told them that he preferred not to be interned because he knew what will happen to a Nisei who is interned. He then knew that 'I (he) would be killed' if interned. He was told to reacquire his citizenship or else 'they will have to stop my food ration and there will be plenty of trouble for me'."

His food was at that time furnished by the dormitory cook, and he had a ration card as an ordinary Japanese student.

"He did not do anything for about a week or ten days when the same two 'Kempei-tai' members appeared and asked him if he had gone through the procedure of reacquiring his Japanese nationality. He replied 'no' and they were 'furious' and told him to be prepared for the worst. He did thereafter go ahead with the procedure.

"Prior to the two visits by the 'Kempei-tai', appellant had heard of Niseis being jailed and beaten by the 'Kempei-tai' and foreigners were shot to death by them and reported as suicides.

"Appellant did not serve in any of Japan's armed services. Neither did he vote at all in Japan."

There was an affidavit which has generally been introduced by plaintiffs in these naturalization cases. Here the government offered it in evidence. It deals in general with the treatment and conditions of the Nisei in Japan during the war. The allegations are summarized here:

"The Nisei in Japan were divided into two groups, students and others. There was no distinction made between Nisei who did or did not have dual nationality. American background was the ground for suspicion.

"A Nisei who enters his name on the family register becomes a Japanese citizen. Some Nisei know they would thereby acquire Japanese nationality. A Nisei who conducted himself in a fairly careful manner could carry on in Japan during the war without harm coming to him. Sympathetic and understanding Government officials were generous in protecting and providing help for these Nisei."

Appellant seems to find comfort in the fact that this affidavit was introduced by the United States. Since the acts and intention of Iwamoto were cardinal, we find it generally immaterial.

If it were necessary, the act of making formal application to a government agency with the deliberate view of reacquisition of Japanese citizenship could be readily distinguished from voting in an election, marrying a foreigner or being drafted into a military organization.

The trial court found that the testimony of Iwamoto "concerning his reasons for reacquiring Japanese nationality is not worthy of belief."

■ This court finds there was evidence in the record which was sufficient to support the finding of fact that the reacquisition of Japanese nationality was voluntary. This evidence was clear and convincing. The only testimony upon which he could rely to establish that he acted under coercion was his own. We agree that the trial court was not bound to accept his testimony as the truth. Since the findings of fact are not therefore "clearly erroneous," the judgment of the District Court must be sustained.

Affirmed.