MATTER OF JOLLEY

In Deportation Proceedings

A-18168898

*Decided by Board March 19, 1970*

Respondent, by formal renunciation of U.S. nationality before an American Consul at Toronto, Ontario, Canada, on May 16, 1967, thereby lost United States citizenship under section 349(a)(6) of the Immigration and Nationality Act, he being presumed under section 349(c) of the Act to have voluntarily performed the expatriating act since he has not testified or offered any evidence to support a conclusion that his renunciation was other than voluntary.*

CHARGES:

Order: Act of 1952—Section 241(a)(1) [8 U.S.C. 1251(a)(1)]—Excludable at time of entry, to wit, immigrant, no visa (section 212(a)(20); 8 U.S.C. 1182(a)(20)).

Lodged: Act of 1952—Section 241(a)(1) [8 U.S.C. 1251(a)(1)]—Excludable at time of entry, to wit, person who departed from or remained outside United States to avoid or evade training or service in the armed forces in time of war or national emergency (section 212(a)(22); 8 U.S.C. 1182(a)(22)).

ON BEHALF OF RESPONDENT:
Peter E. Rindskopf, Esquire
859½ Hunter Street, N.E.
Atlanta, Georgia 30314
(Brief filed)

ON BEHALF OF SERVICE:
Irving A. Appleman
Appellate Trial Attorney
(Brief filed)

Joseph W. Monsanto
Trial Attorney
(Brief filed)

This is an appeal from an order of a special inquiry officer dated November 25, 1968, finding the respondent deportable on both charges above stated and granting voluntary departure within 90 days, with an alternate order for his deportation to

* Reaffirmed, 441 F.2d 1245 (C.A. 5, 1971).

anada if he fails to depart when and as required. The appeal ill be dismissed.

The facts have been fully stated and the evidence has been critically examined in the special inquiry officer's exhaustive and able pinion, and need not be repeated here at length. The special inquiry officer concluded that the evidence had been properly admitted into the record and that it established clearly, convincingly, and unequivocally that the respondent is an alien and that he is deportable as charged. We concur in those conclusions.

At the hearing, the respondent denied that he is an alien and that he is deportable. Indeed, he refused to concede that he is the person to whom much of the documentary proof related. Consequently, the threshhold question presented is one of identity.

The order to show cause, dated March 20, 1968, charges that Thomas Glenn Jolley, the respondent, is not a citizen or national of the United States; that he is a native of the United States and of undetermined citizenship; that he renounced his United States citizenship before an American consul at Toronto, Ontario, Canada on May 16, 1967; that he entered the United States at Detroit, Michigan on an unknown date subsequent to May 16, 1967, for the purpose of resuming his residence; and that at the time of entry he was not in possession of a valid immigrant visa. Deportability was charged under section 241(a)(1) of the Immigration and Nationality Act on the ground that he was inadmissible at entry under section 212(a)(20) of the Act for lack of the required visa.

At the deportation hearing, respondent was represented by counsel, who conceded that respondent is the Thomas Glenn Jolley named in the order to show cause (Tr. p. 10). Called as the Service's first witness over his attorney's objection, respondent on advice of counsel refused to answer most of the questions on self-incrimination grounds. He did testify that he is 24 years old (Tr. p. 26) and that he is married (Tr. p. 27); that he is Thomas Glenn Jolley, married to Margaret Elizabeth Townsend, aged 20, a citizen of the United States born in Atlanta, Georgia (Tr. p. 80); and that he had lived in Canada (Tr. p. 93).

Admitted into evidence over respondent's objection was a certified copy of a birth certificate (Ex. 6) attesting to the birth of Thomas Glenn Jolley on January 26, 1944 in Greensboro, North Carolina. Also admitted over objection were certified copies (Ex. 7) of the following: (1) an oath of renunciation of allegiance under section 349(a)(6) of the Act, signed and sworn to on May 16, 1967 before the American consul at Toronto, Ontario, Canada

by Thomas Glenn Jolley, born at Greensboro, North Carolina on January 26, 1944; (2) a supporting affidavit, executed by Thomas Glenn Jolley on the same day before the same American consul; and (3) a Consular Certificate executed May 31, 1967 and approved by the State Department on June 16, 1967, reciting that Thomas Glenn Jolley, born at Greensboro, North Carolina on January 26, 1944, had expatriated himself on May 16, 1967 under section 349(a)(6) of the Act.

James R. Coplen, a Service investigator, testified over objection that he had interviewed the respondent at the latter's home on March 19, 1968, during the course of an investigation into the respondent's immigration status. Mr. Coplen testified that he had then asked the respondent whether he was the Thomas Glenn Jolley who had renounced his citizenship in Canada and he said he was; that respondent stated he had last entered the United States through the port of Detroit, Michigan, but he refused to state what name he had used or what he told the officials when he entered (Tr. p. 60).

We agree with the special inquiry officer that the foregoing evidence was properly received and that it establishes clearly, convincingly, and unequivocally that respondent is the Thomas Glenn Jolley who executed the renunciation forms at Toronto on May 16, 1967. In our view, the Service has amply met its burden of establishing that the respondent is an alien.

The dissenting opinion strongly contends, however, that on this record it cannot be said that respondent's act of renunciation was voluntary. Even though the respondent did not testify as to the circumstances which led him to execute the renunciation, we agree that it is clearly inferable that respondent's action was motivated by his desire to avoid induction in our armed forces. That this desire may have been based on conscientious scruples does not, in our view, make his act of renunciation any the less deliberate or voluntary. There is no evidence that, confronted with the choice of facing liability to induction or renouncing his citizenship, the respondent was subjected to influences which overbore his free will in making his election.

Our unreported decision of June 26, 1969 in *Matter of Susan B. Anthony* (A-8823447), cited in the dissenting opinion, is readily distinguishable. The expatriating act in that case (an oath of allegiance) took place in 1954 and the deportation proceedings were started in 1961, before the enactment of section 349(c) of the Act. Consequently, under the rule then applicable, as enunciated in *Nishikawa* v. *Dulles*, 356 U.S. 129 (1958), the burden was on

Service to prove not only the expatriating act, but also that it is voluntarily performed; and this burden could be met only by ar, convincing and unequivocal evidence. The respondent in the ithony case testified in the deportation proceedings as to the circumstances surrounding her decision to take the oath of allegiance. We concluded, on the basis of her testimony, which we believed, that the Service had not borne its burden of establishing clear, convincing, and unequivocal evidence that her act was voluntary.

The case now before us is not only factually different but is governed by a different rule. Under section 349(c) of the Act, which now applies, there is a presumption that respondent acted voluntarily in performing the expatriating act; and the burden is on him to rebut that presumption. This he has not done. He has not testified, or offered any evidence, to support a conclusion that his renunciation of allegiance was other than his voluntary and considered choice.

We must also reject respondent's challenge to section 49(a)(6) of the Act. Although the Board may not pass on the constitutionality of the statutes we administer, *Matter of L—*, 4 . & N. Dec. 556 (BIA, 1951), the Attorney General has laid own guide lines for the application of the principles set forth in *Afroyim* v. *Rusk*, 387 U.S. 253 (1967).[1] If anything emerges with crystal clarity from the diverse views expressed in *Afroyim*, it is the unchallenged proposition that an articulated renunciation of allegiance is a constitutionally permissible means of expatriation.

Respondent's alienage having thus been satisfactorily established, under section 291 of the Act the burden is upon him to prove the time, place, and manner of his entry into the United States. The respondent has presented no evidence on this issue. Having failed to sustain his burden, under the specific terms of section 291 respondent is presumed to be in the United States in violation of law. There is no evidence to show that at the time of his entry at Detroit at an unspecified date he was in possession of an immigrant visa or any document in lieu thereof. The charge stated in the order to show cause is clearly sustained.

We have reached the foregoing conclusion without . lying on the portions of respondent's Selective Service record (Ex. 9) received in evidence over his objection. While we agree with the special inquiry officer that these were properly received and that,

---

[1] *Attorney General's Statement of Interpretation Concerning Expatriation of United States Citizens*, 42 Op. Atty. Gen. No. 34 (January 18, 1969); 34 Fed. Reg. 1079.

when coupled with the other evidence, they sustain the lodged charge, we wish here merely to point out that the finding of deportability is amply sustained on the original charge, even without the Selective Service records.

We must also reject respondent's thesis that, even if the Service's charges have been established, his marriage to a United States citizen saves him from deportation under section 241 (f) of the Act. He argues that his entry at Detroit must have involved fraud and that this brings him within the ambit of section 241 (f). Fraud is not an essential ingredient of the documentary charge on which he has been ordered deported. An alien may not pull himself up by his own bootstraps and claim he was guilty of fraud at entry and thereby eligible for the benefits of section 241 (f). See *Ntovas* v. *Ahrens*, 279 F.2d 483 (7 Cir., 1960), cert. denied 364 U.S. 826; *Tsaconas* v. *INS*, 397 F.2d 946 (7 Cir., 1968) ; *Ferrante* v. *INS*, 399 F.2d 98 (6 Cir., 1968). Congress did not intend to grant immunity from deportation to all aliens entering by fraud merely because they have the requisite family ties in this country, *De Vargas* v. *INS*, 409 F.2d 335 (5 Cir., 1969), cert. denied 396 U.S. 895.

Even if fraud were shown to be the basis for the documentary charge under section 212(a) (20), so as to bring into play the rationale of *Muslemi* v. *INS*, 408 F.2d 1196 (9 Cir., 1968), respondent would still not be entitled to the benefits of section 241 (f). That provision requires the alien to be "otherwise admissible at the time of entry." An alien who enters the United States without inspection by a knowingly false claim of citizenship, thereby completely circumventing the immigration visa system, is not "otherwise admissible" within the meaning of section 241 (f), *Matter of Lee*, Interior Decision No. 1960 (A.G., 1969) ; *Gambino* v. *INS*, 419 F.2d 1355 (2 Cir., January 7, 1970) footnote 1.

We have carefully considered the other arguments raised on appeal and find them without merit. The same contentions were urged before the special inquiry officer and he disposed of them properly in his exhaustive opinion. To the cases cited at page 14 of his opinion, as to the admissibility of respondent's admissions to Investigator Coplen, there can now be added *Lavoie* v. *INS*, 418 F.2d 732 (9 Cir., 1969).

The running of the voluntary departure time authorized by the special inquiry officer has been stayed pending this appeal.

**ORDER:** It is ordered that the appeal be and it is hereby dismissed.

*It is further ordered* that, pursuant to the special inquiry

547

officer's order, the respondent be permitted to depart from the United States voluntarily within 90 days of this order or any extension beyond that date as may be granted by the District Director; and that, in the event of failure so to depart, the respondent shall be deported as provided in the special inquiry officer's order.

DISSENTING OPINION: Anthony L. Montaquila, Alternate Member

Since this record fails to establish by clear, unequivocal and convincing evidence that respondent voluntarily and meaningfully renounced his United States citizenship, acquired by reason of his birth here, I dissent from the majority opinion finding loss of American nationality.

The issue presented here is narrowly circumscribed: Did respondent voluntarily and meaningfully intend a renunciation of his citizenship? Do the circumstances leading to such renunciation dilute the oath of renunciation and, thus, render it involuntary and ineffective?

Respondent refused to testify at his deportation hearing other than to state his name, place of birth and recent marriage to a United States citizen.

The evidence presented by the Immigration and Naturalization Service to establish loss of United States citizenship is, in substance, documentary, with the exception of testimony concerning certain draft records relating to one, Thomas Glenn Jolley, the name of respondent; and the testimony of an Immigration inspector who testified that he interviewed respondent who admitted to him that he had renounced his American nationality before an American consul in Canada.

Respondent on May 16, 1967 made formal renunciation of his American nationality pursuant to section 349(a)(6) of the Immigration and Nationality Act, before an American consul in Toronto, Canada, and at the same time, and as part thereof, stated, "I do not wish to break the laws of the United States. These laws (Selective Service) conflict with my present beliefs" (Ex. 7).

Prior thereto, on March 5, 1967, respondent had attempted to secure reclassification of his draft status without success. He had been ordered to report for induction on June 13 and again on August 7, 1967, but failed to do so. He had already departed for Canada on March 31, 1967. He was classified I-A on April 18, 1967 and again on July 19, 1967. On April 7, 1967, while in

Canada, respondent wrote his draft board requesting a I–O classification (that of a conscientious objector available for civilian work contributory to the maintenance of the national health, safety or interest). On April 18, 1967 and again on July 19, 1967, as stated, he was classified I–A. Respondent returned to the United States sometime *after* May 17, 1967, the exact date not having been established.

It was *after* all efforts to secure a change in his draft status, that respondent executed the renunciation on May 16, 1967. So, in reality, the renunciation was to avoid regular army service. He so indicated in the oath of renunciation; and in his letter to the local draft board relative to his renunciation of American nationality.

Thus, as indicated, the issue narrows to whether respondent's renunciation constituted a voluntary and meaningful act.

There is no need here to discuss the effect of various provisions of the statute relating to loss of citizenship [1] or the several decisions of the Supreme Court of the United States relating to the constitutionality thereof,[2] for we are here concerned with the right to renounce American nationality. Section 349(a)(6) of the Immigration and Nationality Act; Act of July 27, 1968, section 1999 of the Revised Statutes. Even in the absence of a statute, formal renunciation of nationality usually has been considered an act of expatriation. 14 Op. Atty. Gen. 295 (1873); Borchard, *The Diplomatic Protection of Citizens Abroad*, 552, 681. However, since 1940, our statutes have recognized the expatriative effect of a formal renunciation of nationality made before an American diplomatic or consular officer outside the United States. Section 401(f), Nationality Act of 1940, 54 Stat. 1169; section 349(a)(6), Immigration and Nationality Act, 8 U.S.C. 1481(a)(6). In addition, a 1944 Act codified in 1952, sanctions renunciation of citizenship in the United States during time of war, if approved by the Attorney General. Section 401(i), Nationality Act of 1940, as amended, 58 Stat. 677; section 349(a)(7), Immigration and Nationality Act, 8 U.S.C. 1481(a)(7).

The Immigration and Naturalization Service receives communications from persons in the United States imprisoned for crime who wish to renounce their citizenship, and those who wish to avoid military service. It would appear that on the basis of the *Afroyim* ruling emphasizing a citizen's voluntary choice to re-

---

[1] Section 1481, Title 8, U.S.C.A.

[2] *Savorgnan v. United States.* 338 U.S. 491 (1950); *Kennedy v. Mendoza-Martinez*, 372 U.S. 144 (1963); *Schneider v. Rusk*, 377 U.S. 163 (1964); *Marks v. Esperdy*, 377 U.S. 214 (1964).

nounce, that some doubt would exist if a statute attempted to circumscribe that choice. The exception would be where a state of war exists and by reason thereof prohibiting renunciation. However, there are no procedures in the present laws as was the case involving Japanese renunciants during World War II. See *Kiyama* v. *Rusk*, 291 F.2d 10 (9 Cir., 1961), cert. denied 368 U.S. 866; *McGrath* v. *Abo*, 186 F.2d 766 (9 Cir., 1951); *Acheson* v. *Murakami*, 176 F.2d 953 (9 Cir., 1949).

In *Afroyim* v. *Rusk*, 387 U.S. 253 (1967), which involved the constitutionality of section 401(e), Nationality Act of 1940, relating to loss of American nationality by voting in a foreign election, the court questioned the power of Congress to expatriate without consent. However, there is unanimity in the right of voluntary renunciation or abandonment by the citizen himself. However, the court did not indicate what constitutes voluntary relinquishment of citizenship. As indicated in the Attorney General's interpretation of the Supreme Court's decision in *Afroyim* as to what constitutes voluntary renunciation, it is necessary to look to earlier decisions of the court. In *Perez* v. *Brownell*, 356 U.S. 44 (1958), overruled by *Afroyim*, the Chief Justice stated that it has long been recognized that citizenship may not only be voluntarily relinquished through exercise of the right of expatriation but also by other actions in derogation of undivided allegiance to this country; and in *Nishikawa* v. *Dulles*, 356 U.S. 129 (1958), Justice Black stated that, of course, a citizen has the right to abandon or renounce his citizenship and that Congress can enact measures to regulate and affirm such abjuration.

The *Afroyim* ruling apparently does not affect the right of renunciation of citizenship under section 349(a)(6) of the Immigration and Nationality Act upon which the respondent's act is based. Hence, for example, expatriation may result by naturalization in a foreign state or the taking of a *meaningful* oath of allegiance to a foreign state, and the like. But even in these situations the act must be voluntary and meaningful.

The rule should be no less here. It would seem that in all such cases, including renunciation, the person involved should be given, to the extent possible, an opportunity to state fully all the facts and circumstances, and the motives and purposes surrounding the expatriative act, with emphasis on ascertaining the intent in performing such act. While respondent gave very limited testimony, the other evidence of record appears clear on this important aspect of the case.

Whatever else may emanate from respondent's conduct in

violating the draft laws, criminal proceedings or otherwise, his continued attempts at reclassifications, both before and after he left the United States, his stated reasons at the time of renunciation and his letter to the draft board the following day, all concerned with his prospective status in the military, evince a clear intent that his act was involuntary. While renunciation cannot be used as "on again, off again" to justify a change of mind, respondent's act was not a normal act of renunciation. He did not acquire a new nationality but became a "man without a country." The possibility of deportation is remote, if not indeed, improbable.

The circumstances of this case bring it squarely within the ruling of this Board in the *Matter of Susan B. Anthony,* A-8823447 (June 26, 1969), that the taking of an oath of allegiance to the British Crown was, because of surrounding circumstances, involuntary, and, hence, not expatriative. And in the case of *Baker* v. *Rusk,* decided by a Federal District Court in California in March 1969, it was held that an oath of allegiance to King George V was not meaningful. The renunciation must involve duress, whether economic or otherwise. *Stipa* v. *Dulles,* 233 F.2d 551 (3 Cir., 1956). Where the renunciant's intent is clear, as here, that renunciation is the result of factors not consonant with a normal desire to abandon or change citizenship, then the burden on the sovereign is a heavy one. The loss must be established by clear, unequivocal and convincing evidence. *Nishikawa* v. *Dulles,* 356 U.S. 129; *Gonzales* v. *Landon,* 350 U.S. 926 (1955); cf. *Matter of Jacuzzi,* A-16841893, approved by Attorney General Rogers February 2, 1959. In the absence thereof, retention of citizenship is favored. *Schneiderman* v. *United States,* 320 U.S. 118 (1943); *Chin Chuck Ming* v. *Dulles,* 225 F.2d 849 (9 Cir., 1955); *Yee Mee* v. *Dulles,* 136 F. Supp. 199 (U.S.D.C., W.D. Pa., 1955); *Fletes-Mora* v. *Rogers,* 160 F. Supp. 215 (U.S.D.C., S.D. Cal., 1958).

Because of the conclusion reached herein, it is unnecessary to reach other issues presented by this record.

I would hold that respondent retains his American citizenship acquired at birth.